# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

| | | |
|---|---|---|
| RALPH BYRD COOPER, JR., | ) | |
| | ) | Case No. 2:17-cv-23 |
| *Petitioner,* | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Cynthia R. Wyrick |
| RANDY LEE, | ) | |
| | ) | |
| *Respondent.* | ) | |

---

## MEMORANDUM OPINION

---

Petitioner Ralph Cooper, Jr. has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. §2254, challenging the constitutionality of his detainment pursuant to his conviction in Anderson County for aggravated rape (Doc. 2). After reviewing the parties' filings and the relevant state-court record, the Court has determined that Petitioner is not entitled to relief under §2254 and that no evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons set forth below, the §2254 petition will be **DENIED**, and this matter will be **DISMISSED**.

## I. BACKGROUND

In 2003, an Anderson County grand jury indicted Petitioner for aggravated rape and aggravated assault.[1] *State v. Cooper* (*Cooper II*), 321 S.W.3d 501, 503 (Tenn. 2010). After the indictment, but prior to trial, the State filed a "Notice of Intention to Use Prior Bad Acts for

---

[1] The State dismissed the aggravated assault charge prior to trial. *State v. Cooper* (*Cooper I*), No. E2008-02044-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 615, at *2 (Tenn. Crim. App. Aug. 3, 2009).

Impeachment and Enhancement of Sentence," providing notice of Petitioner's numerous prior convictions, including Oregon convictions for three counts of felony sodomy. *Id.*

In 2006, an Anderson County jury convicted Petitioner of the aggravated-rape charge. *Id.* At trial, the victim testified that she met Petitioner in December 2002 "while cruising in a Walmart parking lot in Oak Ridge, Tennessee," and they exchanged phone numbers. *Id.* Another time, the victim and Petitioner went to "his mother's house, where he lived in a basement apartment." *Cooper II*, 321 S.W.3d at 503; *Cooper I*, 2009 Tenn. Crim. App. LEXIS 615, at *2. The victim testified that, on the night of the rape, she called Petitioner to ask him to "hang out" with her and her friend, Shelly Johnson. *Cooper II*, 321 S.W.3d at 503. Then, she and Ms. Johnson went to Petitioner's apartment, rode around with him in his truck while drinking beer and Jack Daniel's, and later went to a party with him. *Id.*

The victim testified that, due to her intoxication, she did not remember leaving that party. *Id.* She woke up naked in Petitioner's bed, with Petitioner, also naked, on top of her. *Cooper I*, 2009 Tenn. Crim. App. LEXIS 615, at *3–4. She testified that Petitioner "had his hands around her throat," and when she threatened to scream, Petitioner told her he would kill her if she did. *Id.* at *4. She stated that Petitioner attempted to have sex with her but could not because "it wasn't wet." *Id.* She told Petitioner to stop, but he refused. *Id.* He momentarily left the room to get lubrication, and when he returned "used the lubricant to facilitate his penetration of the victim's vagina." *Id.* at *4–5. The victim testified that she did not attempt to leave when Petitioner left the room, because she "wasn't that familiar with the house" and "didn't know how long he was going to be," and that when he returned she cooperated because "[t]here wasn't nothing [she] could do." *Id.* She stated that Petitioner did not ejaculate, but when he finished, he

laid down like he was going to sleep. *Id.* at *5. While she waited for him to fall asleep, she "passed out." *Id.*

The victim stated that she awoke the next morning, dressed herself,[2] and used the restroom in the apartment, where she noticed "all them scratches and marks on [her] throat and stuff." *Id.* When she went back to the bedroom to retrieve her jacket and car keys, Petitioner woke up and "asked for a hug." *Id.* The victim stated that she hugged him and left, exiting through the upstairs of the house, where she encountered Petitioner's mother and another woman. *Id.* at *5–6. She did not recall speaking with the women, other than saying "goodbye." *Id.* at *6.

The victim next went to the home of a friend,[3] who tried to convince her to report the incident to the police, but the victim refused because she felt both "guilty" and as if the situation were her fault because she had been drinking while underage. *Id.* After going home and taking a shower, the victim went to see her boyfriend at his workplace, where she told him about the incident. *Id.* Her boyfriend took her to the Oak Ridge Police Department to file a report, where she spoke with Detective Ron Boucher, who recommended that she go to the emergency room at Methodist Medical Center. *Id.*

Detective Boucher testified that he spoke with the victim at the police department around 12:30 p.m. *Id.* at *7. He took photographs of the victim's face and neck that depicted "fresh" wounds, and the photographs were later shown to the jury. *Id.* Based on this interview, Detective Boucher obtained an arrest warrant against Petitioner. *Id.* The following day,

---

[2] Notably, the victim did not put on her bra, which she testified was not among her other clothes.

[3] The record is not explicit about this friend's identity, but it appears this friend was Ms. Johnson, the same friend who went to Petitioner's home and attended the party the previous night.

Detective Boucher was also "present when an Oak Ridge Police Department officer pulled the defendant's truck over." *Id.* Detective Boucher testified that the victim's bra was hanging from the visor of Petitioner's truck. *Id.*

Later that evening, Detective Boucher spoke to Petitioner, who, after waiving his *Miranda* rights, gave a statement which he then wrote and signed. *Id.* Petitioner's statement detailed that on the evening in question, the victim called and asked if she and a friend could "go riding around" with him. (Doc. 7-6, at 13.) He stated that the three of them, along with Petitioner's cousin Charles Smith, drove to a golf course, drank beer and Jack Daniel's,[4] and then went to a party at Petitioner's friend's house. *Id.* He said that Ms. Johnson passed out at the party, "so we took her home . . . ." (*Id.*) He stated that he, the victim, and Mr. Smith returned to Petitioner's apartment and continued drinking and that after some time, he asked the victim if she wanted to go to bed, to which she replied "yes." (*Id.*) He stated that they went into his bedroom, took off their clothing, and began having sexual intercourse. (*Id.*) Then the victim told him, "I don't think your [sic] going to get there so stop," but he did not, so she "pushed on [him]," and then the two scuffled. (*Id.*) He stated that he went to get lotion to use as lubricant after the victim told him again to stop because he was hurting her since she was "dry," and that they then continued having intercourse. (*Id.*) He stated that the victim again told him, "I really don't think your [sic] going to get there so let's stop." (*Id.* at 14.) He admitted that he still did not stop, which resulted in another scuffle. (*Id.*) After the victim again requested that Petitioner stop, he complied, and Petitioner and the victim fell asleep. (*Id.*) Petitioner stated that when they woke up the next morning, the victim hugged him, and they talked for a few minutes before she left.

---

[4] By Petitioner's account, the group got three twelve-packs of Bud Light and four pints and a "5th" of Jack Daniel's. (Doc. 7-6, at 13.)

(*Id.*)  Detective Boucher's account of this statement indicated that Petitioner told him that the victim requested for the intercourse to stop four separate times before Petitioner stopped and that, when questioned, Petitioner neither confirmed nor denied choking the victim.  (*Id.*)

Petitioner likewise testified at trial.  *Cooper I*, 2009 Tenn. Crim. App. LEXIS 615, at *11. He testified that, at his first meeting with the victim in the Wal-Mart parking lot, he made a sexual remark towards her, she motioned for him to approach her, and they exchanged phone numbers after having a conversation filled with sexual innuendos.  *Id.*  A couple of weeks later, he and the victim went "four-wheeling" together and consumed alcohol, and, although she requested to stay at his house, he took her to her own home.  *Id.*  Later, he saw the victim at a convenience store, and she asked him to call her again.  *Id.*

Petitioner's testimony about the evening of the rape was largely similar to the statement he gave to police.  However, contrary to his previous statement to the police, he did not say that the victim told him to stop, but, rather, only that she "was dry and . . . was kind of hurting."  *Id.* at *12.  He said that he retrieved lotion to use as lubricant, and he and the victim continued having sex without her objection.  *Id.*  He stated that the two scuffled after the victim asked, "are you ever going to get off," but he characterized this as "more of just kind of rough sex . . . and she was getting into it . . . ."  *Id.* at *13.  When she asked again if he was ever going to "get off," he asked if she wanted to quit, and when she said yes, he complied.  *Id.*  Petitioner held out that the victim never cried out or asked him to stop, and that he never threatened her, injured her, or kept her from leaving the house.  *Id.*

The jury convicted Petitioner of aggravated rape.  *Id.* at *15.  After the jury's verdict, the State filed a "Sentencing Position," in which it indicated an intent to use Petitioner's prior Oregon convictions for sodomy, which has identical elements to Tennessee's "Rape of a Child,"

to sentence Petitioner as a "repeat violent offender" under Tennessee Code Annotated § 40-35-120.[5] *Id.* at *16. After a hearing, the court sentenced Petitioner as a repeat violent offender to life imprisonment without the possibility of parole. *Id.* at *19.

Petitioner filed a *pro se* motion for a new trial claiming ineffective assistance of trial counsel, which newly appointed counsel later amended to include additional allegations that counsel was ineffective, that the evidence was insufficient, and that the state failed to timely file notice regarding the sentencing enhancement. (Doc. 7-1, at 28–30.) However, at the hearing on this motion, Petitioner focused his arguments mostly on the state's lack of notice of its intent to sentence Petitioner as a repeat violent offender. (Doc. 7–5.) Ultimately, his motion was denied. (Doc. 7-1, at 46.)

Petitioner next filed a direct appeal to the Tennessee Court of Criminal Appeals ("TCCA"). (Doc. 7-7.) He challenged the sufficiency of the evidence at trial and claimed that the trial court erred in finding him to be a repeat violent offender, because the "State did not prove a separate period of incarceration for his Oregon sodomy convictions." (*Id.*) In addition to these claims, the TCCA considered *sua sponte* "whether the post-verdict filing of the notice of the defendant's status as a repeat violent offender," and his sentencing as such, constituted reversible error. *Cooper I*, 2009 Tenn. Crim. App. LEXIS 615, at *8. The TCCA found no merit to either of Petitioner's raised issues and found that, under plain-error review, it could not grant Petitioner relief regarding the state's untimely notice, because it could not discern "from the record whether the violation of the statute adversely affected defendant." *Id.* at *36, *38.

---

[5] Tennessee Code Annotated § 40-35-120 provides that a defendant who fits the statutory definition of a "repeat violent offender" shall be sentenced to "imprisonment for life without the possibility of parole." Relevant to Petitioner's case, a repeat violent offender is one who is convicted of aggravated rape who has a prior conviction of rape of a child. *See* Tenn. Code Ann. § 40-35-120(a)(3)–(4), 120(c)(1)(E)–(F).

Petitioner then filed a Rule 11 Application for Permission to Appeal to the Tennessee Supreme Court ("TSC"), and review was granted. (Docs. 7-10, 7-11.) In Petitioner's appellate brief to the TSC, he raised only one issue: "The State's failure to file an adequate repeat violent offender notice prior to trial pursuant to the requirements of [Tennessee Code Annotated §] 40-35-120(i)(2) should result in the [petitioner] being granted a new trial." (Doc. 7-12, at 4.) However, the TSC additionally considered the sufficiency of the evidence and whether the trial court properly determined that Petitioner was a repeat violent offender. *Cooper II*, 321 S.W.3d at 505–08. The TSC affirmed in part and reversed in part, finding that, while the evidence was sufficient and the lower court properly identified Petitioner as a repeat violent offender, the State did not file adequate pretrial notice of its intent to sentence Petitioner as a repeat violent offender. *Id.* The court noted that this impacted Petitioner's substantial rights because it impacted plea negotiations, among other things, and thus warranted remand to the trial court for resentencing. *Id.*

Petitioner's case then returned to the trial court, where he was sentenced to sixty years as a repeat offender. (Doc. 7-15, at 41.) Petitioner again appealed to the TCCA, alleging that the trial court erred in sentencing him as a career offender when it "failed to make a determination of the elements of the Oregon crime of sodomy in the first degree," "failed to state on the record that it found 'beyond a reasonable doubt' that [Petitioner] is a career offender," and "failed to make a determination that none of the three offenses occurred within 24 hours of the commission of any other sodomy in the first-degree offense." (Doc. 7-19.) The TCCA affirmed his sentence. *State v. Cooper* (*Cooper III*), No. E2012-01023-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 616, at *1 (Tenn. Crim. App. July 22, 2013). Petitioner filed an application for permission to appeal to the TSC, but review was denied. (Docs. 7-22, 7-23.)

Next, Petitioner filed a *pro se* post-conviction petition in which he alleged:

(1) Ineffective Assistance of Counsel for:

    a. Counsel's failure to call Emily Cooper (Petitioner's mother), Tracy Strickland, and Rita Moleas as witnesses;

    b. Counsel's failure to interview witnesses who may have seen the victim on the date of the incident, including the victim's friend and boyfriend;

    c. Counsel's failure to call Ms. Cooper after promising her testimony in opening arguments;

    d. Counsel's failure to adequately investigate and prepare for trial;

    e. Counsel's failure to interview and/or call Ms. Johnson as a witness;

    f. Counsel's failure to interview and/or call party attendees as witnesses;

    g. Counsel's failure to present a sexual-assault expert;

    h. Counsel's failure to develop a defense that Petitioner did not avoid arrest;

    i. Counsel's failure to investigate alternative theories of defense;

    j. Counsel's failure to investigate the victim's sexual history;

    k. Counsel's failure to object to the chain-of-custody issues with the victim's bra;

    l. Counsel's unfulfilled promise in opening arguments that he would prove that Petitioner and the victim had consensual sex;

    m. Counsel's unfulfilled promise in opening arguments to prove that the victim fabricated her story;

> n. Counsel's prejudicial statements about Petitioner during closing arguments;
>
> o. Counsel's failure to form a working relationship with Petitioner; and
>
> p. Counsel's failure to produce necessary, certified documentation regarding Petitioner's prior incarcerations.

(2) Petitioner's sentence, with a dictate that it be served at sixty percent, is illegal because Tennessee law requires that it be served at one-hundred percent.

(3) Petitioner's conviction and sentence were obtained in violation of due process because of the State's failure to timely file a "repeat violent offender" notice.

(4) Petitioner's sentence was enhanced in violation of due process rights because Petitioner was not made aware that his Oregon convictions could be used against him at a later date.

(5) Petitioner's sentence was imposed in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because he was mentally incompetent but allowed to represent himself.

(6) Petitioner's conviction was in violation of his Sixth, Eighth, and Fourteenth Amendments because the jury instructions were constitutionally infirm.

(Doc. 7-24, at 4–26.) Petitioner's appointed counsel then filed a supplementary brief specifically incorporating Petitioner's brief by reference and raising additional grounds for relief. (*Id.* at 29–30.)[6] The trial court denied Petitioner post-conviction relief. (*Id.* at 33.)

---

[6] The additional grounds raised by counsel were: "illegally obtained confession, evidence gained pursuant to an unconstitutional search and seizure of Petitioner's truck, violation of the privilege against self-incrimination, unconstitutional failure of the prosecution to disclose evidence favorable to the Defendant/Petitioner; and illegal evidence." (Doc. 7-24, at 29–30.) Counsel likewise alleged ineffective assistance of counsel for trial counsel's failure to file a motion to

Petitioner appealed this judgment to the TCCA raising three claims: (1) that the trial court erred by denying a continuance sought for the purpose of locating witnesses, (2) that the trial court erred by denying Petitioner's oral motion for new counsel, and (3) that the trial court erred by denying Petitioner's petition for post-conviction relief "as to all grounds raised by the appellant in his petition." (Doc. 7-27.) Notably, the only facts Petitioner alleged to support his third claim related to alleged ineffective assistance of counsel for failing to interview or call witnesses and for counsel's remarks during closing argument. The TCCA affirmed the dismissal of his petition. (Doc. 7-30); *Cooper v. State* (*Cooper IV*), No. E2015-01071-CCA-R3-PC, 2016 Tenn. Crim. App. LEXIS 412, at *2 (Tenn. Crim. App. June 3, 2016). Petitioner filed another application for permission to appeal to the TSC, which denied review. (Docs. 7-31, 7-32.)

Finally, Petitioner filed the instant petition, which is an exact replica of his state-court petition for post-conviction relief. (Doc. 2.)

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. §2254, a district court may not grant habeas-corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

suppress Petitioner's inculpatory statements. These claims did not advance past this point and are not relevant to any of Petitioner's future claims.

28 U.S.C. § 2254(d)(1), (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause if the state court decides a question of law or a materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To grant habeas relief under the "unreasonable application" clause, the Court must find that the state court's decision was an "objectively unreasonable," and not simply an erroneous or incorrect, application of the correct legal principle to the facts. *Id.* at 409-11. AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). When the record supports the state court's findings of fact, those findings are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III.     ANALYSIS

### A.  Exhaustion and Procedural Default

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by exhaustion requirements and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In order for a claim to be considered on habeas review, the petitioner must first exhaust state remedies for that claim. 28 U.S.C. §2254(b)(1). Exhaustion requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *see O'Sullivan*, 526 U.S. at 842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of

presentation to the state's highest court. Tenn. S. Ct. R. 39. If a claim has never been presented to the highest available state court and is now barred from such presentation by a state procedural rule, that claim is procedurally defaulted and barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default may also occur when a petitioner presented the claim to the highest court but the state court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground. *Id.* (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)).

The claims Petitioner raises in his federal habeas petition are identical to those included in his petition for state post-conviction relief. Indeed, the argument section of his federal petition appears to be a photocopy of that section of his state petition. (Doc. 2; Doc. 7-24, at 4–26.) In this petition, Petitioner raises twenty-one claims, including: (1) sixteen claims of ineffective assistance of counsel, (2) that the sixty-percent-release-eligibility portion of his sentence renders his sentence legally invalid, (3) that his conviction and sentence were in violation of due process because of the State's failure to timely file a notice of intent to sentence him as a repeat violent offender, (4) that his sentence was enhanced in violation of due process because he was not aware that his prior convictions could be used to enhance future sentences, (5) that his sentence violated due process because he was mentally incompetent but allowed to represent himself, and (6) that the jury instructions provided at trial were constitutionally infirm. Petitioner has thrice been before the TCCA, once on direct appeal, once appealing the trial court's judgment at his resentencing, and once appealing the trial court's denial of post-conviction relief. He has been

before the TSC only once, appealing the TCCA's judgment on direct appeal.[7]  However, of the claims now before the court, only six of Petitioner's claims of ineffective assistance of counsel — specifically those related to counsel's failure to interview and call certain witnesses and counsel's remarks about Petitioner during closing arguments —  were properly presented to either the TCCA or the TSC.[8]  Raising some claims of ineffective assistance of counsel to the lower courts does not allow Petitioner to now raise any claim of ineffective assistance of counsel. The exhaustion doctrine "requires that the same claim under the same theory be presented to state courts before raising it in a habeas petition."  *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987).  At this time, due to Tennessee's one-petition rule and one-year statute of limitations, Tenn. Code Ann. § 40-30-102(a),(c), state remedies are foreclosed to Petitioner, thus rendering his unpresented claims technically exhausted but procedurally defaulted.  *See Engle v. Isaac*, 456

---

[7] Petitioner filed two additional applications for permission to appeal to the TSC, one regarding his resentencing and one regarding the denial of post-conviction relief.  However, such presentation does not satisfy exhaustion requirements, as raising a claim, "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor, [does not] constitute fair presentation."  *Olson v. Little*, 604 F. App'x 387, 402 (6th Cir. 2015) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

[8] Petitioner did challenge in state court the State's lack of timely notice regarding its intent to sentence Petitioner as a repeat violent offender, which the TSC found warranted remand to the trial court for resentencing.  However, this claim is not properly before the federal court for several reasons.  First, while he now challenges that the lack of notice violated his due-process rights, he did not present this claim as a violation of any federal right to the state court and therefore did not "fairly present" it.  Second, even if Petitioner had raised this to the state court as a violation of "due process," "general allegations of the denial of a 'fair trial' or 'due process' have been held insufficient to 'fairly present' federal constitutional claims."  *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).  Finally, this claim is not cognizable on federal habeas review because it challenges a violation of a state procedural rule regarding sentencing, which is not a federal constitutional ground on which to challenge his confinement.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984) (stating that federal courts may not issue a writ of habeas corpus "on the basis of a perceived error of state law"); *see also Olsen v. McFaul*, 843 F.2d 918, 933 (6th Cir. 1988) ("For excellent reasons, claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting the writ of habeas corpus.").

U.S. 107, 125-26 n. 28 (1982). These claims may only be considered on their merits if Petitioner adequately pleads cause and prejudice. *Wainwright*, 433 U.S. at 84.

### B. Cause and Prejudice

A claim that has been procedurally defaulted may be considered on its "merits only if the petitioner establishes cause for his failure to comply with the state procedural rule and actual prejudice from the alleged violation of federal law" or "demonstrates that his is 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); s*ee also House v. Bell*, 547 U.S. 518, 536 (2006). To show sufficient "cause," Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488. Where petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner bears the burden of proving cause and prejudice, which requires him to do more than "rely on conclusory assertions of cause and prejudice"; instead, he must "present affirmative evidence or argument as to the precise cause and prejudice produced." *Lundgren v. Mitchell*, 440 F.3d 754, 763–64 (6th Cir. 2006). Here, construing the petition liberally due to Petitioner's *pro se* status, the Court finds that Petitioner asserts two alternative arguments as to cause: (1) that he received ineffective assistance of counsel, and (2) that a miscarriage of justice will occur if his claims are not considered. (Doc. 10, at 17.)[9]

---

[9] The Court's construction is based on several assertions Petitioner makes in his reply. (Doc. 10, at 17.) He claims that the default resulted because the facts were not developed at the "state court hearing," the factual disputes were not resolved, and the "fact finding procedure" was inadequate. (*Id.*) He likewise claims that he did not receive a full, fair, and adequate hearing, and that he was denied due process. (*Id.*) He also claims that the state court did not appoint him

### i. Ineffective Assistance of Counsel

Generally, because there is "no constitutional right to an attorney in state post-conviction proceedings," the ineffective assistance of counsel in post-conviction proceedings does not qualify as "cause" to excuse procedural default of constitutional claims. *Coleman*, 501 U.S. at 725, 755. However, the United States Supreme Court has carved out a narrow exception that allows a substantial claim of ineffective assistance of post-conviction counsel to constitute cause for underlying claims of ineffective assistance of counsel when the state limits presentation of those claims to post-conviction proceedings or employs a procedural framework that "makes it highly unlikely . . . that a defendant [had] a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (citing *Martinez v. Ryan*, 566 U.S. 1, 18 (2012)).[10] This exception applies in Tennessee. *See Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014). For ineffective assistance of counsel to constitute cause to excuse Petitioner's procedural default of his claims, this Court must find that: (1) the claims of ineffective assistance of trial counsel were "substantial," (2) there was no counsel or counsel was ineffective during the state collateral review, (3) the state collateral review proceeding was the "initial" review proceeding, and (4) the state-law system requires or strongly encourages ineffective-assistance claims to be raised in initial-review collateral proceedings. *Trevino v. Thaler*, 569 U.S. at 423 (citing *Martinez*, 566 U.S. at 13–14, 16–17).

---

competent counsel, and that his default "resulted from an unconstitutional state action." (*Id.*) Petitioner alleges no facts to support these claims, and many of these arguments do not suffice to show cause even if assumed to be true. The Court does not find that any of Petitioner's conclusory statements excuse his procedural default.

[10] Hence, ineffective assistance of counsel could provide cause only for Petitioner's ten defaulted claims of ineffective assistance of counsel, not for his remaining five claims. *See Abdur-Rahman v. Carpenter*, 805 F.3d 710, 714–16 (6th Cir. 2015) (noting that the Sixth Circuit has only applied the *Martinez* exception to claims of ineffective assistance of counsel).

The *Martinez/Trevino* framework will not excuse Petitioner's procedural default, because his defaulted claims were, in fact, raised at Petitioner's initial collateral-review proceeding (i.e., at the post-conviction trial level). As the argument section of Petitioner's federal habeas petition is a photocopy of the argument section of his state post-conviction petition, it is clear that each of his current claims was raised on post-conviction. However, each was later abandoned on appeal. As the *Martinez/Trevino* framework excuses default only when a claim was not presented at the first opportunity to do so, it does not apply here.

### ii. Miscarriage of Justice

Petitioner summarily states that he "has shown cause for any prejudice [sic] from any default. The failure to reach the merits would constitute miscarriage of justice." (Doc. 10, at 17.) The "fundamental miscarriages of justice" excuse for procedural default is often used to describe the "actual innocence" prong on which procedural default may be excused. *See Dretke v. Haley*, 541 U.S. 386, 388 (2004). Given no other indication or argument from Petitioner as to why he believes a miscarriage of justice would occur if his claims were not addressed, he appears to raise an "actual innocence" excuse. However, in order to warrant review under this theory, a habeas petitioner must establish in light of new, reliable evidence – either eyewitness accounts, physical evidence, or exculpatory scientific evidence – that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *House*, 547 U.S. at 536 (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner has pointed to no "new" evidence, that is, evidence not available at the time of trial, of his actual innocence. *See Schlup*, 513 U.S. at 324. As such, this argument will not suffice to excuse his procedural default.

### C.  Merits Analysis

Petitioner's only remaining claims refer to the ineffective assistance of counsel. Specifically, Petitioner's non-defaulted claims include that trial counsel: (1)  failed to present "competent, material, and resident" Ms. Cooper, Ms. Strickland, and Ms. Moleas as witnesses; (2) failed to interview witnesses who may have seen the victim on the night or day of the incident, including the victim's friend and boyfriend; (3) failed to call Ms. Cooper to testify after promising her testimony in opening arguments; (4) failed to interview or call Ms. Johnson, the victim's friend, as a witness; (5) failed to interview or call witnesses who were at the party with Petitioner and the victim the night of the incident; and (6) made "highly prejudicial comments" about Petitioner during closing arguments.  For the following reasons, the Court finds that Petitioner's counsel was not ineffective, and Petitioner is not entitled to relief.

To successfully prove that counsel was constitutionally ineffective, a defendant must establish:  (1) that counsel's performance was deficient such that he was no longer "functioning as the 'counsel' guaranteed under the Sixth Amendment," and (2) that counsel's "performance prejudiced the defense . . . so as to deprive the defendant of a fair trial" and undermine the reliability of trial results.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficiency, the defendant must show "that counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.

The Supreme Court has clarified that when a federal court reviews a state court's application of *Strickland*, which sets its own high bar for claims, "establishing that a state court's application was unreasonable under §2254(d) is all the more difficult."  *Harrington v. Richter*,

562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "In those circumstances, the question before the habeas court is 'whether there is any reasonable argument that counsel satisfied *Strickland*'*s* deferential standard.'" *Id.*; *see Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA").

### i. Failure to Interview and Call Witnesses

Petitioner claims that his counsel failed to interview and call various witnesses at trial. He contends that his trial counsel should have interviewed and called party attendees, who would have testified about the victim's "mischievous and permissive sexual behavior." (Doc. 2, at 17.) He likewise claims that counsel failed to interview and call Ms. Johnson, the victim's friend who was with them that night, to testify to the victim's behavior and mental state at and upon leaving the party. (*Id.*) He next claims that counsel should have interviewed the victim's friend and boyfriend, who would have testified that the victim had no sign of injuries on her face or neck the next morning. (*Id.* at 15–16.) Petitioner claims that counsel should have called Ms. Cooper, Ms. Strickland, and Ms. Moleas, all of whom could have corroborated Petitioner's version of events. (*Id.* at 15.) Respondent contends that the TCCA's holding that counsel was not ineffective was not unreasonable, as Petitioner admitted to having sex with the victim after she told him "no," and none of these witnesses would have altered this confession. (Doc. 8, at 12– 15.)

At post-conviction hearings, trial counsel testified that he "subpoenaed the witnesses that [he] thought would be helpful to his case," but did not subpoena all the witnesses requested by Petitioner. (Doc. 7-25, at 25–26.) He noted that Petitioner "had a hard time understanding that just because he and the victim drank together did not make any sex consensual," and he decided

not to call witnesses that would have testified only to their drinking together that day. (*Id.*) He likewise noted that he chose not to call witnesses who could have introduced the fact that Petitioner was convicted of a robbery of his own aunt and grandmother or mother, who used wheelchairs, while his case was pending. (*Id.*) The TCCA ruled that counsel was not ineffective because he failed to call Petitioner's proposed witnesses. *Cooper IV*, 2016 Tenn. Crim. App. LEXIS 412, at *11. The court noted that these witnesses were "either not able to testify about the incident or were a liability because of their history with the Petitioner." *Id.* It found that instead of focusing on these witnesses, counsel made a "well informed and tactical" decision to attempt to impeach the victim, who, other than Petitioner, was the only witness to the event. *Id.*

The failure to interview and the failure to call witnesses represent two distinct inquiries. *See English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). To determine if counsel was ineffective for failing to investigate, the Court must assess the reasonableness of counsel's "investigation or lack thereof." *Id.* As with all ineffective-assistance claims, Petitioner must still demonstrate prejudice resulting from this action. *Strickland*, 466 U.S. at 687. To show that counsel was ineffective for failing to call witnesses, Petitioner must establish that the witness had favorable information and that the lack of that witness's testimony prejudiced his defense. *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010) (citing *Towns v. Smith*, 395 F.3d 251, 258–60 (6th Cir. 2005)). However, "defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).

The Court cannot find that there was no reasonable argument that counsel was effective when the testimony of Petitioner's proposed witnesses is largely speculative and definitely could not have described the events that took place in Petitioner's bedroom. In his statement to police,

Petitioner confessed to continuing sexual intercourse with the victim after she repeatedly requested that he stop. Even if the party attendees or Ms. Johnson would have testified that the victim behaved flirtatiously, this testimony would not counteract Petitioner's own admission that he later continued having sex with the victim over her objection.[11] As to the witnesses who Petitioner claims would have testified about the events of the next morning and the lack of markings on the victim's face and neck, for many of these witnesses, there is no indication that they would have testified to this fact or that they had any other information that was favorable to Petitioner. For others, specifically Petitioner's mother, grandmother, and aunt, trial counsel determined that the potential benefit of calling these witnesses for corroborative testimony was outweighed by the risks associated with their testimony, namely, that it would come before the jury that while out on bond and awaiting trial, Petitioner robbed his aunt and mother, both of whom have medical disabilities.[12] The Court does not find that counsel was unreasonable in his decisions not to interview or call these witnesses, nor that Petitioner was prejudiced by the lack

---

[11] Moreover, by Petitioner's own admission, Ms. Johnson became incapacitated, or "passed out" at the party due to her alcohol consumption. (Doc. 7-6, at 13.) Additionally, it was not unreasonable for counsel to determine that calling Ms. Johnson was futile given that she had no information about the victim's state upon leaving the party or any events that occurred afterwards.

[12] Petitioner additionally challenges counsel's failure to call Petitioner's mother, Ms. Cooper, after promising her testimony in opening arguments. The Sixth Circuit has held that "it is unreasonable for counsel to promise testimony to the jury without first examining the availability and soundness of such testimony . . . . ," *Plummer v. Jackson*, 491 F. App'x 671, 677 (6th Cir. 2012) (citing *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010)), because such unfulfilled promises can create negative inferences in the mind of the jury, who may wonder why the promised testimony was not proffered, *English*, 602 F.3d at 729. However, *English* makes clear that, in this context, ineffective assistance of counsel exists when counsel fails to reasonably investigate the basis for the promise, not for merely making the unfulfilled promise. *Id.* Here, while it appears that counsel originally planned to call Ms. Cooper and did subpoena her (Doc. 7-25, at 9), he made a strategic decision at trial that the risks outweighed the benefit of her cumulative testimony. Such a decision did not render him deficient. Moreover, Petitioner fails to show prejudice occurring from counsel's unfulfilled statement of intent to call Ms. Cooper.

of presentation of these witnesses such that the results of his trial were undermined. Petitioner is not entitled to relief on this claim.

### ii. Closing-Argument Remarks

Petitioner claims that trial counsel made highly prejudicial comments about Petitioner to the jury during closing arguments. (Doc. 2, at 22.) Specifically, Petitioner claims that trial counsel said, "Look at the defendant. He's been to prison, he has tattoos, he's a bad man. The victim wanted a date with a bad man. I think she got what she asked for." (*Id.*) Respondent contends that trial counsel's decision to make these remarks was part of an overall strategy to discredit the victim. (Doc. 8, at 29–31.) As a strategic choice by counsel, Respondent argues that this does not amount to a Sixth Amendment violation, and that Petitioner has not shown prejudice arising from these statements. (*Id.*)

At post-conviction hearings, trial counsel testified that he undertook a strategy of impeaching the victim, as she was one of the only two witnesses to the incident and had made inconsistent statements in the past, thereby putting her veracity at issue. *Cooper IV*, 2016 Tenn. Crim. App. LEXIS 412, at *11. Counsel indicated that he remarked about Petitioner's appearance to the jury as part of this strategy, to demonstrate that the victim reasonably knew what kind of situation she was putting herself in. *Id.* The TCCA, noting that defense strategy is left to the discretion of counsel and is generally not a basis for post-conviction relief, found that counsel's tactics were sound strategy to impeach the victim. *Id.*

Assuming *arguendo* that trial counsel's remark was improper such that it undermined the reasonableness of his performance, the question before the Court is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Strickland*, 466 U.S. at 694. Counsel's performance is not unreasonable merely because it differs from the tactics the Court would have pursued itself. *See Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) (holding that "[s]trategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation."). Given the weight of the evidence against him, including Petitioner's admission to police that he had sex with the victim after she told him "no," Petitioner cannot show that the result of the trial would have been reasonably likely to be different had counsel not made such remarks. Petitioner has not shown that this one remark rendered counsel ineffective or that he was prejudiced by it, and he is not entitled to relief on this claim.

## IV.    CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus (Doc. 1) will be **DENIED,** and this action will be **DISMISSED**.

## V.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to

deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484. Reasonable jurists would not disagree that counsel's performance was constitutionally effective. Accordingly, a **COA SHALL NOT ISSUE.**

AN APPROPRIATE JUDGMENT WILL ENTER.

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**